1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT

10          EASTERN DISTRICT OF CALIFORNIA

11

12   NO CASINO IN PLYMOUTH and              No.  2:12-cv-01748-TLN-CMK
     CITIZENS EQUAL RIGHTS ALLIANCE,

13
                    Plaintiffs,

14          v.                              **MEMORANDUM AND ORDER**

15
     S.M.R JEWELL, in her official capacity as

16   Secretary of the UNITED STATES
     DEPARTMENT OF THE INTERIOR, et

17   al.,

18                  Defendants,

19          and

20   IONE BAND OF MIWOK INDIANS,

21                  Defendant Intervenors.

22

23          The matter is before the Court on cross motions for summary judgment brought by

24   Plaintiffs No Casino in Plymouth and Citizens Equal Rights Alliance's ("Plaintiffs"); Federal

25   Defendants John Rydzik, the U.S. Department of Interior, Amy Dutschke, Tracie Stevens, Kevin

26   Washburn, the National Indian Gaming Commission, Paula Hart, and Sally Jewell

27   ("Defendants"); and Defendant Intervenors the Ione Band of Miwok Indians ("Defendant

28   Intervenors").  For the reasons discussed below, Plaintiffs' Motion for Summary Judgment (ECF

                                          1

No. 72) is DENIED.  Defendants' Motion for Summary Judgment (ECF No. 90) is GRANTED.

Defendant Intervenors' Motion for Summary Judgment (ECF No. 91) is GRANTED.[1]

**INTRODUCTION**

This lawsuit presents a challenge to the Record of Decision ("ROD"), issued on May 24, 2012, by Donald Laverdure, Acting Assistant Secretary of Indian Affairs, Department of the Interior,[2] concerning the acquisition of the Plymouth Parcels property in trust for the Ione Band of Miwok Indians, in anticipation of the construction of a gaming-resort complex.  Plaintiffs' First Amended Complaint in this action states five causes of action, which are:

- The Department lacks the authority to take land into trust for the Ione Band because it was not a "recognized tribe now under Federal jurisdiction" in 1934 when the Indian Reorganization Act was enacted.  25 U.S.C. § 479.

- The Department failed to comply with its regulations, 25 C.F.R. § 151.10–13 when it reviewed and approved the ROD.

- The trust acquisition violates various federalist principles, including the Equal Footing Doctrine and the Tenth Amendment to the U.S. Constitution.

- The Department incorrectly determined that the trust acquisition constitutes the "restoration of lands for an Indian tribe that is restored to Federal recognition," 25 U.S.C. § 2719(b)(1)(B).

- The Department's environmental analysis, necessary before the Department approved the trust acquisition, was inadequate under the National Environmental Policy Act ("NEPA").

This case is related to Case No. 12-cv-1710-TLN-CKD (hereinafter "Case No. 1710"), also before this Court.  In that case, Plaintiff Amador County also challenged the ROD.  The parties moved for summary judgment, and an Order from this Court – Case No. 1710, ECF No. 95 – will be filed concurrently with its Order in this lawsuit.  The Court has considered the issues

---

[1] Also addressed below: the Court GRANTS Defendant Intervenors' Motion to Strike (ECF No. 77), but provides further analysis on the issues presented by that motion.

[2] The Court uses the umbrella term "Department" throughout this Order, with the understanding that the relevant agency actions in this case are largely undertaken by sub-unit the Bureau of Indian Affairs, or other agencies as noted.

1    and arguments presented by the parties in Case No. 1710, in tandem with the issues and

2    arguments presented in the instant case.

3                    **STATUTORY AND REGULATORY FRAMEWORK**

4    **I.      The Indian Reorganization Act of 1934**

5            Congress enacted the Indian Reorganization Act ("IRA") in 1934. "The overriding

6    purpose of that particular Act was to establish machinery whereby Indian tribes would be able to

7    assume a greater degree of self-government, both politically and economically." *Morton v.*

8    *Mancari*, 417 U.S. 535, 542 (1974). "[T]he Act reflected a new policy of the Federal

9    Government and aimed to put a halt to the loss of tribal lands through allotment. It gave the

10   Secretary of the Interior power to create new reservations, and tribes were encouraged to

11   revitalize their self-government through the adoption of constitutions and bylaws and through the

12   creation of chartered corporations, with power to conduct the business and economic affairs of the

13   tribe." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973).

14           Of particular relevance here, section 5 of the IRA authorizes the Secretary of the Interior

15   to acquire in her discretion "any interest in lands … for the purpose of providing land for

16   Indians." 25 U.S.C. § 465. Section 5 further provides that any such lands "shall be taken in the

17   name of the United States in trust for the Indian tribe or individual Indian," and "shall be exempt

18   from State and local taxation." *Id.* The Secretary has also promulgated regulations governing the

19   implementation of section 5. *See e.g.* 25 C.F.R. § 151.3(a)(3) (providing that trust acquisition

20   may occur "[w]hen the Secretary determines that the acquisition of the land is necessary to

21   facilitate tribal self-determination, economic development, or Indian housing").

22           The IRA also defines "Indians" in several ways, including as "all persons of Indian

23   descent who are members of any recognized Indian tribe now under Federal jurisdiction," and

24   further defines "tribe" to mean "any Indian tribe, organized band, pueblo, or the Indians residing

25   on one reservation." 25 U.S.C. § 479. In 2009, in *Carcieri v. Salazar*, 555 U.S. 379, 382, the

26   U.S. Supreme Court clarified that, "for purposes of § 479, the phrase 'now under Federal

27   jurisdiction' refers to a tribe that was under federal jurisdiction at the time of the statute's

28   enactment. As a result, § 479 limits the Secretary's authority to taking land into trust for the

1  purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA

2  was enacted in June 1934."

3  **II.        The Indian Gaming Regulatory Act**

4          In 1988 Congress enacted the Indian Gaming Regulatory Act ("IGRA") to regulate

5  gaming operations owned by Indian tribes.  The IGRA's purpose includes: "to provide a statutory

6  basis for the operation of gaming by Indian tribes as a means of promoting tribal economic

7  development, self-sufficiency, and strong tribal governments."  25 U.S.C. 2702(1).

8          Section 20 of the IGRA generally prohibits tribal gaming on lands acquired by the

9  Secretary in trust after October 17, 1988, unless the acquisition falls within one of the Act's

10  exemptions or exceptions.  25 U.S.C. § 2719.  For example, lands acquired after October 17,

11  1988, may still be eligible if they are part of: "(i) a settlement of a land claim, (ii) the initial

12  reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment

13  process, or (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition."

14  25 U.S.C. § 2719(b)(1)(B).  Another exception involves a determination by the Secretary that "a

15  gaming establishment on newly acquired lands would be in the best interest of the Indian tribe

16  and its members, and would not be detrimental to the surrounding community."  § 2719(b)(1)(A).

17          The specific exception relied upon by the Department in the instant case is contained in

18  section 2719(b)(1)(B)(iii): "the restoration of lands for an Indian tribe that is restored to Federal

19  recognition" (hereinafter the "restored lands" exception).

20          In May, 2008, the Bureau of Indian Affairs ("BIA") published regulations implementing

21  IGRA section 20, codified at 25 C.F.R. § 292 (the "Part 292 regulations").  The Part 292

22  regulations became effective in August, 2008.  73 Fed. Reg. 35,579.  Of particular relevance to

23  this action are sections 292.7, 292.10, and 292.26(b).

24          Sections 292.7 ("What must be demonstrated to meet the 'restored lands' exception"?)

25  and 292.10 ("How does a tribe qualify as having been restored to Federal recognition?") provide

26  criteria by which the restored lands exception can be met.

27          In the instant case, however, the ROD relies upon section 292.26(b), the "grandfathering"

28  provision, to meet the restored lands exception.  The grandfathering provision provides that the

4

1 Part 292 regulations shall not apply to agency actions when, prior to enactment of those

2 regulations, the Department or the National Indian Gaming Commission ("NIGC") had already

3 issued a written opinion regarding the restored lands exception and the property at issue.  25

4 C.F.R. § 292.26(b).  Here, the Department relies upon an Indian Lands Determination issued in

5 2006, which found the Plymouth Parcels eligible for gaming.  Thus, the Plymouth Parcels fall

6 outside application of the Part 292 regulations as set out in the ROD where the Department

7 determined that the restored lands exception is met.

**PROCEDURAL HISTORY**

9 Plaintiffs brought the first amended complaint ("FAC") in this action, on October 1, 2012.

10 (ECF No. 1.)  Plaintiffs filed their motion for summary judgment on Claim 1 in the FAC, on

11 October 14, 2014.  (ECF No. 72.)  Defendants and Defendant Intervenors filed their respective

12 motions for summary judgment, with respect to the FAC in full (Claims 1 through 5), on

13 December 15, 2014.  (ECF Nos. 90, 91.)  All parties have filed responsive briefs; for Plaintiff,

14 this has included responding to Defendants and Defendant Intervenors' motions for summary

15 judgment on Claims 1 through 5 in the FAC.[3]  (ECF Nos. 93, 94, 96.)

16 Accordingly, before the Court now are all parties' cross motions for summary judgment

17 on Claim 1 in the FAC, and Defendant and Defendant Intervenors' additional motions for

18 summary judgment on Claims 2 through 5 in the FAC.

19 Earlier in this litigation, Plaintiff submitted a request for judicial notice of numerous court

20 filings and other judicial and/or authoritative decisions, notably those that were part of litigation

21 involving the Ione Band and the Department in the 1990s, *Ione Band of Miwok Indians et al. v.*

22 *Harold Burris et al.,* No. CIV-S-90-0993 (E.D. Cal.).  (ECF NO. 62.)  No party has objected to

23 the fact that the statements contained in these exhibits were made; accordingly, the Court takes

24 judicial notice of these exhibits and the statements therein.

**STANDARD OF REVIEW**

26 This Court's review is governed by the Administrative Procedures Act ("APA").

---

[3] Plaintiffs' response (ECF No. 93) largely restates the allegations in the FAC.

5

1  Ordinarily, summary judgment is appropriate when the pleadings and the record demonstrate that

2  "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

3  matter of law." Fed. R. Civ. P. 56(c).  However, in a case involving review of a final agency

4  action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the

5  limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F.

6  Supp. 2d 76, 89 (D.D.C. 2006).  Rather, "[u]nder the APA, it is the role of the agency to resolve

7  factual issues to arrive at a decision that is supported by the administrative record, whereas 'the

8  function of the district court is to determine whether or not as a matter of law the evidence in the

9  administrative record permitted the agency to make the decision it did.'" *Id.* at 90 (quoting

10  *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985)).  In this context, summary

11  judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is

12  supported by the administrative record and otherwise consistent with the APA standard of

13  review." *Id.* at 90.  Pursuant to the APA, the reviewing Court shall "hold unlawful and set aside

14  agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of

15  discretion or otherwise not in accordance with law," or which have been taken "without

16  observance of procedure required by law." 5 U.S.C. § 706(2).

17                                        **BACKGROUND**[4]

18          According to Defendant Intervenors, the Ione Band of Miwok Indians traces its ancestry

19  to Miwok and Nisenan people, who historically have resided on lands that today make up

20  Amador County.  (AR3528–301.)  In the early part of the 20th Century Congress established a

21  land purchase program, which enabled the BIA to purchase land throughout California with the

22  aim of alleviating Indian landlessness and homelessness.  (AR499–502; 644–45.)  As further

23  explained in the *Ethnohistorical Overview of the Ione Band of Miwok Indians* (2005), prepared

24  for the Ione Band (hereinafter the "*Ethnohistorical Overview*"), the BIA appointed special agent

25  C.E. Kelsey in 1905–06 to investigate the conditions of dispossessed California tribal members,

26  including in Amador County.  (AR3543.)  His investigation included taking a census of the

___
[4] Here, the Court notes many of the relevant events and communications between the Ione Band and the Federal
Government that are identified in the ROD, and others that are documented within the administrative record.

27

28

1    number of surviving Indian people residing at specific localities, including "Buena Vista

2    [Richey],"[5]  "Ione," "Jackson Valley", and the "Jackson Reservation".  (AR3543–44; *see also*

3    "Census of Non-Reservation California Indians, 1905 – 1906" by C.E. Kelsey, AR3774.)  In

4    1915, BIA special agent John Terrell revisited many of the Indian communities in California,

5    using Kelsey's census as a guide.  (AR3544.)  According to Terrell's "Census of Ione and vicinity

6    Indians," which included divisions for people living "At Jackson belonging to the Ione Band" and

7    "At Richey belonging to the Ione band," there were 101 "Ione and vicinity" Indians.  (AR3544–

8    45.)

9          As further explained in the *Ethnohistorical Overview*, Terrell "located the Ione village,

10   which consisted of three homes and a sweat house, at about three and one-half to four miles out of

11   Ione." (AR3547.)  "Terrell emphasized the importance of securing land for the Ione Band, and

12   initiated negotiations for the purchase of forty acres, which included the Indian residences on the

13   property … The purchase was approved, and attempts to finalize it were made between 1916 and

14   1930, but the transaction was never completed because the government was unable to obtain clear

15   title to the land." (AR3547.)  *See also* "Authority" form, May 18, 1916, for the "PURCHASE OF

16   LANDS FOR LANDLESS INDIANS IN CALIFORNIA" and allotting $2000 for "the purchase

17   of 40 acres of land in Amador County, California (described by metes and bounds) from the Ione

18   Coal & Iron Company, for the use of 101 homeless California Indians, designated as the Ione

19   Band, at not to exceed $50 per acre." (AR160.)  *See* Letter from the Acting Assistant

20   Commissioner of Indian Affairs to the Secretary of the Interior, "enclos[ing] herewith a partially

21   executed deed, abstract of title in two volumes, and plat of survey in connection with the desired

22   purchase of 40 acres in Amador County, at the price of $2,000 from the Ione Coal & Iron

23   Company, for the use of 101 homeless California Indians, designated as the Ione Band.  [¶]  The

24   tract in question is the ancient village site of these Indians and contains some rich valley land."

25   (AR4634–35.)  It appears that efforts to acquire the aforementioned 40 acre parcel, called the

26

27   _____
     [5] The Court understands that, in the early 20th century, the "Buena Vista" location or "Buena Vista" Indians were
28   sometimes referred to as the location or Indians "at Richey".

"Arroyo Seco Ranch," were ultimately abandoned around 1941.[6]  (AR3549; 506; 3972.)

According to a tribal history prepared by Ione Band member Glen Villa Sr., in 1996: "Buena Vista Rancheria, a 70 acre parcel of land 4 miles south of Ione, was purchased for the Ione Band.  Some of the people identified in the 1915 census already lived at this site which was an old Indian village called Upusuni." (AR3972.)  *See also Buena Vista Rancheria Miwok Indian Tribe Background Materials*, explaining: "The Buena Vista Rancheria was established as trust land for the Tribe's benefit by the Secretary of the Interior under the Authority of the Act of 1914 in 1928." (AR900.)

It appears there was minimal subsequent communication, or none, between the Ione-area Indians and the federal government until the 1970s.  By the early 1970s, some members of the Ione Band had renewed their interest in securing BIA housing assistance and to secure control over the aforementioned 40 acre parcel.  Accordingly, in 1972 the individuals filed an action in Amador County Superior Court to quiet title to the parcel.  *See* Letter from the Acting Area Director to the Commissioner of Indian Affairs, dated July 20, 1972, stating: "[t]he California Rural Indian Land Project, a project of California Indian Legal Services, has filed an action in the Superior Court of the State of California for the County of Amador to quiet title on a 40-acre parcel for the benefit of members of the Ione Band of Indians.  A copy of the complaint is enclosed." (AR531.)  In 1972 the court awarded title to the parcel to plaintiffs, which included individuals and "other members of the Ione Band of Indians."  (AR535–36, *Villa v. Moffatt*, No. 8160, California Superior Court, Amador County.)

On October 18, 1972, Commissioner of Indian Affairs Louis Bruce sent a letter to the Ione Band, stating in relevant part: "[The BIA] has been informed that the Indians continue to desire that the land ultimately be taken by the United States and held in trust status … Federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated … I therefore, hereby agree to accept by relinquishment of title or gift the following described parcel of land to be held in trust for the Ione Band of Miwok Indians: [40

---

[6] It appears that throughout the early twentieth century, and continuing until the Plymouth Parcels were substituted, the main parcel sought on behalf of the Ione Band was part of the "Arroyo Seco Ranch".  The Court hereinafter refers to this parcel either as the "40 acre parcel" or the "Arroyo Seco parcel".

8

1   acre parcel described].”  (AR533–34.)

2          Others within the BIA questioned the conclusiveness of the Bruce determination.  For

3   example, the Assistant Secretary of the Interior wrote to the BIA Sacramento Area Director in

4   1973, stating “the former contemplated purchase of land for [the Ione Band] by the United States

5   may indicate that they are a recognizable group entitled to benefits of the Indian Reorganization

6   Act.  We have no correspondence, however, from the group requesting recognition or a desire to

7   establish a reservation.  If the Band desires and merits Federal recognition, action should be taken

8   to assist them to perfect an organization under the provisions of the Indian Reorganization Act.”

9   (AR537.)  In January, 1975, the Department’s Office of the Solicitor wrote to the Sacramento

10  Area Director stating: “The Solicitor’s Office is presently considering our proposal that the Ione

11  Indians be extended Federal recognition.”  (AR560.)  In January, 1976, the Director of the BIA’s

12  Office of Indian Services requested additional information regarding the historical existence of

13  the Band, and whether it met the necessary criteria for recognition.  (AR574.)  In April, 1976, a

14  BIA Tribal Operations Officer wrote to California Indian Legal Services, explaining that it

15  needed help in verifying “that the recent quiet title action instituted by named Ione Indians ‘and

16  others’ was in fact a representative action, and that title to the subject tract is being held by the

17  parties and on behalf of the Ione Band.”  (AR580.)

18         In 1978, the Department promulgated regulations outlining procedures whereby groups of

19  Indians could attain federal recognition as Indian tribes (hereinafter referred to as the “Part 83

20  regulations”).  25 C.F.R. §§ 83.1–13.  At that time, the BIA also issued a list of federally-

21  recognized Indian tribes, and a list of groups whose petitions for recognition were on file at the

22  BIA.  The Ione Band appeared on the latter list.  (AR597.)

23         Defendants and Defendant Intervenors assert – as is stated in the ROD – that at some

24  point in the 1970s, the federal government began consistently taking the position that the Ione

25  Band was not a federally-recognized tribe, and therefore a de facto termination occurred.  For

26  example, a 1990 letter from Hazel Elbert, Deputy to Harold Burris, Sr. explained the position that

27  the Bruce recognition was not in fact a recognition and that the Band was not federally

28  recognized.  (AR20808–12.)  In litigation involving members of the Ione Band in the 1990s (the

1    *Burris* litigation, discussed *infra*), the government initially argued that in order for the Ione Band

2    to be federally recognized, it had to follow the procedures outlined in the Part 83 regulations.  The

3    Interior Board of Indian Appeals, in 1992 in *Ione Band of Miwok Indians v. Sacramento Area*

4    *Director*, decided that the Ione Band had not yet been recognized and that to become recognized

5    it would need to follow the acknowledgement procedures stated in the Part 83 regulations.

6    (AR812.)  A 1992 letter from Assistant Secretary-Indian Affairs Brown also took the position that

7    to achieve federal recognition the Ione Band would have to follow the procedures stated in the

8    Part 83 regulations.  (AR4779.)  In an undated briefing paper, apparently issued by the

9    Department to the "President of the United States," the Department reiterated that: "It is the

10   Department's position that this group has never attained Federal tribal status and is not, therefore,

11   eligible for restoration … It is our position that the Ione Band should continue to seek to establish

12   Federal status through the BIA's acknowledgement process."  (AR794–95.)

13          In 1994, the federal government reversed course.  In a letter dated March 22, 1994,

14   Assistant Secretary-Indian Affairs Deer stated she was reaffirming the portion of the 1972 Bruce

15   letter which stated that "[f]ederal recognition was evidently extended to the Ione Band of Indians

16   at the time the Ione land purchase was contemplated."  The Deer letter further stated: "As

17   Assistant Secretary of Indian Affairs I hereby agree to accept the land designated in the Bruce

18   letter to be held in trust as territory of the Tribe."  The Deer letter further stated that the Band

19   would henceforth be included on the list of Indian Entities recognized and eligible to receive

20   services from the BIA.  (AR4312.)  The Ione Band was placed on the Federal Register's list of

21   recognized tribes in 1995, and Defendants represent that it has been on the Federal Register's list

22   since then.  (AR4826.)

23          In a July, 1994 follow-up letter to her March, 1994 letter, Deer clarified: "In my [previous

24   letter], while I agreed in principle to accept that parcel of land referred to in the Bruce letter and

25   which the Federal court in 1972 ruled belonged to various named members of the band, this does

26   not mean that the Bureau will presently begin a process of taking this land into Federal trust."

27   (AR1126.)  That follow-up letter further explained that "The title to this land [i.e. the 40 acre

28   Arroyo Seco parcel] is not clear and its ownership is currently the subject of litigation.  This

1    litigation must be resolved before the land could be considered for possible trust status.  As an

2    alternative, it may be more expedient if land elsewhere could be taken intro trust for the band."

3    (AR1126.)

4         According to the *Ethnohistorical Overview*, in January, 1996, the Ione Band met in

5    Plymouth to establish a joint Interim Council, and an enrollment committee was formed.  The

6    enrollment committee established the following criteria for enrollment in the Ione Band of Miwok

7    Indians: 1) an individual must be a lineal descendant of the 1915 "Census of Ione and Vicinity

8    Indians by J.J. Terrell; or must be a lineal descendent of the 1972 judgment of *Villa vs. Moffat*; 2)

9    an individual must possess Miwok blood; and 3) an individual must have had consistent

10   interaction with the Tribe through cultural contacts with residents of the 40 acre tract that was the

11   subject of the 1972 judgment.  The BIA compiled a list of individuals who met these

12   requirements, which was posted in the Amador Dispatch newspaper in May, 1996.  (AR3550–51.)

13        In September, 2004, the Ione Band submitted a request to the Department for an Indian

14   Lands Determination (hereinafter "ILD") regarding the Plymouth Parcels.  (AR1401–13.)  In

15   November, 2005, with the ILD request pending, the Ione Band submitted its application to the

16   Department to have the Plymouth Parcels taken into trust for gaming purposes.  (AR2751–3482.)

17   In September, 2006, Associate Solicitor, Division of Indian Affairs, Carl Artman issued a

18   determination (hereinafter referred to as the "2006 ILD") that the Plymouth Parcels met the

19   restored lands exception; the 2006 ILD references the Bruce and Deer letters, among other

20   instances of interaction between the federal government and the Ione Band.  (AR5550–54.)

21        Following issuance of the 2006 ILD, Amador County and the State of California appealed

22   that determination to this Court.  This Court dismissed that action as untimely on the basis that

23   the trust application had not yet been approved.  *See Cnty. of Amador, Cal. v. U.S. Dep.'t of

24   Interior*, 2007 WL 4390499, at *4 (E.D. Cal. Dec. 13, 2007).

25        In January, 2009, Solicitor David Bernhardt circulated a withdrawal memorandum and

26   draft legal opinion to various members of the DOI, including the NIGC.  The memorandum stated

27   in relevant part:  "We are now in the process of reviewing the preliminary draft Final

28   Environmental Impact Statement for the Plymouth Parcel.  As a result, I determined to review the

1    Associate Solicitor's 2006 Indian lands opinion and have concluded that it was wrong.  I have

2    withdrawn and am reversing that opinion.  It no longer represents the legal position of the Office

3    of the Solicitor.  The opinion of the Solicitor's Office is that the Band is not a restored tribe within

4    the meaning of the IGRA."  (AR7112.)

5         However, in a memorandum issued in July, 2011, Solicitor Hilary Tompkins stated, with

6    regard to the Bernhardt position: "The Draft Opinion was never issued and the Withdrawal

7    Memorandum was not acted upon on behalf of the Department by any individual with delegated

8    authority to make decisions under the IGRA."  (AR8823.)  The Tompkins memorandum further

9    stated: "For these reasons, I hereby rescind the Withdrawal Memorandum and decline to issue the

10   Draft Opinion.  I also hereby reinstate the Restored Tribe Opinion regarding the Ione Band's

11   eligibility to conduct gaming on the land in question."  (AR8824.)

12        On February 24, 2009, the U.S. Supreme Court decided *Carcieri v. Salazar*, 555 U.S. 379,

13   holding that section 19 of the IRA "limits the Secretary's authority to take land into trust for the

14   purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA

15   was enacted in June 1934."  *Id.* at 382.  Amador County sent comments to the Department

16   thereafter, arguing that the Secretary lacked authority to take land into trust for the Ione Band, and

17   the Ione Bond sent responsive comments and submitted evidence that the Ione Band had been

18   under federal jurisdiction in 1934.  (AR7757–97; 8000–210; 8872–9191.)  In May, 2012, the

19   ROD issued, concluding among things that the Ione Band was under federal jurisdiction within

20   the meaning of the IRA and *Carcieri*.

21                                         **ANALYSIS**[7]

22   **I.      Defendant Intervenors' motion to strike**

23        On October 21, 2014, after Plaintiffs filed their motion for summary judgment in this case,

24   attorney Mark Kallenbach applied for and was granted pro hac vice status.  (ECF Nos. 75 & 76.)

25   To be clear, that application signed by this Court stated that Mr. Kallenbach represented tribal

26   member Nicholas Villa, Jr. and the "Historic Band of Miwok Indians," although this Court's

27   _____

[7] In consideration of the arguments made by the parties, the Court finds Plaintiffs have standing to sue. (ECF No. 93 at 23; ECF No. 90-1 at 5–7.)

28

docket incorrectly indicated that Mr. Kallenbach was afforded pro hac vice status on behalf of Intervenor Defendants.  (ECF Nos. 75 at 1; 76.)  On October 29, 2014, Defendant Intervenors moved to strike that pro hac vice application and to set aside the Court's order.  (ECF Nos. 77.) Subsequent filings have explained the inconsistent positions taken by Mr. Villa versus Intervenor Defendants.

According to Mr. Villa the Ione Band that has intervened in this lawsuit, on whose behalf trust acquisition will occur, have sought to increase their membership rolls in order to wrest control from those in the Ione Band who have actual genealogical ties to the Indians living in Amador County in the early part of the 20th century.  It appears Mr. Villa is in fact listed as a member of the Ione Band (Intervenor Defendants) on its membership rolls,[8] but he states the group in this lawsuit no longer represents the proper genealogical descendants of the Ione Band. Hence, Mr. Villa assigns the term "Historic Band of Miwok Indians" to refer to his lineage and others who represent the more historically accurate group, to be distinguished from Defendant Intervenors the Ione Band of Miwok Indians.

Mr. Villa states that private investors have funded the Ione Band's efforts to construct a casino, which has included giving money or gifts to buy membership involvement.  (ECF No. 81 ¶ 3.)  *See* ECF No. 81-6 (Flier for "Ione Band of Miwok Indians 2014 Distribution," stating: "Starting November 25th, the tribe will be distributing $400 to adult tribal members who turn 18 on or before November 24, 2014.")  Mr. Villa states that few of the members constituting the 750-plus member Ione Band bear true affiliation to the Historic Band.  (ECF No. 81 ¶ 4.)  Mr. Villa states: "[t]he Historic Ione Band of Miwok Indians resides on approximately 40 acres of land located at 2919 Jackson Valley Road, Ione, California.  The monuments memorializing the properties boundaries are still intact … The present community of the Historic Ione Band of Miwok Indians considers the aforementioned 40 acre parcel to be their reservation.  One water supply services all of its residents' dwellings. No one pays real estate taxes on the reservation land to Amador County or to the State of California."  (ECF No. 81 ¶¶ 9, 10.)

---

[8] *See* ECF No. 77-1 ¶ 8.

1      Mr. Villa also submits a supporting declaration from Professor Al Slagle.[9]  (*See* ECF No.

2  82 at 4–8.)  Of note are Mr. Slagle's observations regarding the Ione Band's tribal elections that

3  took place in the 1990s.  Mr. Slagle states that in 1989 Mr. Villa was elected as the Ione Band's

4  chairman and led the efforts to obtain federal acknowledgement of the tribe.  (ECF No. 82 ¶ 27.)

5  Mr. Slagle states: "In 1994, at the request of Chief Villa, I completed a 90 page 'Petition for

6  Status-Reaffirmation of the Ione Band of Miwok Indians.'  The petition was augmented with

7  narratives and supporting documents submitted by me to the Department of the Interior (in

8  cooperation with the Tribe) on previous occasions.  I presented the petition and supporting

9  documentation to the staff of Assistant Secretary of the Interior Ada E. Deer in Washington,

10  D.C."  (ECF No. 82 ¶ 50.)  Mr. Slagle further states that in that petition, he offered his opinion

11  that the Ione Band – as it existed in 1994 – met the requirements of 25 C.F.R. §§ 83.1–11, i.e. the

12  Part 83 regulations which provide procedures for establishing federal recognition.  (ECF No. 82

13  ¶¶ 51–52.)  Hence, in March, 1994, Assistant Secretary Deer issued her determination that the

14  Ione Band was recognized, and addressed her determination to Mr. Villa as the tribe's leader.

15  (ECF No. 82 ¶ 52.)[10]

16      Mr. Slagle further states that after the 1994 Deer affirmation, the Ione Band requested a

17  secretarially-supervised IRA election to approve a tribal constitution, but subsequently, in

18  October 1994, unanimously withdrew its request for IRA reorganization.  (ECF No. 82 ¶ 28.)

19  After the BIA accepted the Ione Band's request to withdraw from IRA reorganization, various

20  factions of the Ione Band formed, including the Villa and Burris groups.  (ECF No. 82 ¶¶ 43–54.)

21  The tribal elections that occurred with BIA assistance, which apparently concluded in September

22  of 1996, were done without the Villa group's participation.  Mr. Slagle further states:

23

24  [9] This declaration was apparently offered in *Burris v. Villa*, No. CIV-S-97-531 (E.D. Cal.).

25  [10] However, *see* Secretary Deer's July, 1994 follow-up letter to her March, 1994 letter: "[I]t should be made clear that
26  the intent of my letter was to recognize the entire group of Miwok Indians associated with the land in Amador
County.  It was not my intent to recognize one or the other factions currently existing under separate leaders, nor do
we believe there are in fact two separate groups."  (AR1126.)  "It was not my intent to displace Mr. Harold E. Burris
27  as the Tribal Chairman of the Ione Band of Indians … I recommend that an interim council be formed incorporating
leaders from both sides."  (AR1127.)

28

- "Neither the Villa nor the Burris groups, which represent more than two-thirds of the members of the land base tribe, have recognized the validity of the election."  (ECF No. 82 ¶ 60-3.)

- "A careful examination of the Enrollment Committee's record shows that virtually all persons the Enrollment Committee listed as their 'members' never had any degree of social or political affiliation with the Ione Band prior to April 1996 – when their names suddenly began appearing on 'potential member lists' before they even had applied for membership."  (ECF No. 82 ¶ 60-5.)

- "Fewer than half of those persons qualified as adult voting members of the Tribe at the time of its recognition were on the list of potential voters in the 1996 election, or permitted to participate in the election."  (ECF No. 82 ¶ 60-11.)

- "92% of the names on the 'potential voters' lists in September 1996 never participated in the Tribe, never lived on the land base, or had ancestry residency or age information available to the Tribe confirming their qualification to vote in this election."  (ECF No. 82 ¶ 60-12.)

Thus, Mr. Villa's position would be that the current party that represents itself to the Court as Defendant Intervenors – in terms of its membership and its tribal government – does not accurately represent the genealogically accurate, or historically correct, Ione Band.

Defendant Intervenors offer little in the way of substantive response to Mr. Villa's or Mr. Slagle's allegations that Defendant Intervenors, on whose behalf trust acquisition will occur, has seen its membership expansion balloon to a capacity such that it no longer represents the Ione Band in any historically accurate way.[11]  Nonetheless, Defendant Intervenors respond that the Court should disregard all of Mr. Villa's additional briefing on the basis that Mr. Villa or his purported party, the Historic Band of Miwok Indians, is not actually a party before this Court. (ECF No. 85.)  Defendant Intervenors are correct that neither Mr. Villa nor a party named the "Historic Band of Miwok Indians" has sought to intervene in this case.  Clearly, Mr. Villa takes a

---

[11] Or in a way that would meet the Part 83 criteria.

1    position that Defendant Intervenors do not take.  Defendant Intervenors, represented by the law

2    firm Holland & Knight, LLP, expressly state they have not hired Mr. Villa's attorney, Mr.

3    Kallenbach, to represent them.  (ECF No. 77-1.)  The Court also notes that Mr. Villa apparently

4    sought to overturn the ROD on the grounds he states herein, in *Villa v. Salazar*, No. 13-cv-700-

5    TLN-CKD.  *See* Complaint, Case No. 13-cv-700-TLN-CKD, ECF No. 1 ¶ 12 ("The group calling

6    itself the Ione Band of Miwok Indians, for which the Acting Assistant Secretary for Indian

7    Affairs has authorized the trust acquisition of the Plymouth Tracts for gaming purposes, includes

8    as purported members persons with little or no ancestral or other connection to the historic Tribe

9    head by Mr. Villa and his father.")  Mr. Villa filed a complaint in that case, in June, 2012 in the

10   District Court for the D.C. Circuit; after transfer to this District, he voluntarily dismissed that

11   lawsuit on April 23, 2013.  (Case No. 13-cv-700-TLN-CKD, ECF No. 21.)

12          Defendants support Defendant Intervenors' motion to strike.  (ECF No. 78.)  In their

13   attached exhibits, Defendants explain that the Department recognizes the current chairwoman of

14   the Ione Band, Ms. Yvonne Miller, and that they do not recognize Mr. Villa as authorized to

15   speak on behalf of the Band.  They explain the BIA Pacific Regional Office has in the past

16   advised Mr. Villa to work with the Ione Band to resolve tribal leadership concerns he may have.

17   (ECF No. 78-1 at 3.)  Defendants also point out that subsequent memorandum from the

18   Department, issued closely after the initial March, 1994 Deer determination addressed to Mr.

19   Villa, noted competing factions within the Ione Band.  *See* July 27, 1994 Deer Memorandum: "I

20   am writing to clarify, notwithstanding any indication to the contrary, that the Department of the

21   Interior recognizes as one entity the entire group of Indians associated with the lands near the

22   town in Amador County, California. It was not the intent of the letters and memoranda to

23   recognize two distinct entities.  Further, it was not and is not this Department's intent to recognize

24   any specifically named person as a leader of the entity. Indeed, this Department has neither the

25   authority nor the power to determine the leadership of any Tribe or Band. That decision is

26   decidedly for the membership of that entity."  (AR1129.)

27          For their part, Plaintiffs articulate the issue well:  "Basically, the two factions are using the

28   Court's Pro Hac Vice Order as a forum to litigate who is, or should be, in control of the Ione

16

1   Band of Miwok Indians.  In contrast, the primary issue in Plaintiffs' lawsuit is whether the Ione

2   Band of Miwok Indians was a federally recognized tribe in 1934 and therefore entitled to fee-to-

3   trust benefits of the Indian Reorganization Act of 1934." (ECF No. 87 at 2.)  Plaintiffs do not

4   join in Defendant Intervenors' motion to strike.  Plaintiffs take the position that the Court's order

5   granting Mr. Kallenbach's pro hac vice position should not be set aside.  (ECF No. 87 at 3.)

6   Plaintiffs do dispute, however, Mr. Villa's position that the Ione Band (whether Mr. Villa's group

7   or Defendant Intervenors) is a federally recognized tribe.  (ECF No. 87 at 6.)

8           In consideration of all of the foregoing, the Court finds the following.  First, it does not

9   appear to be disputed that Mr. Kallenbach's pro hac vice application satisfies the requirements of

10  Local Rule 180(b)(2), but for the glaring fact that Mr. Kallenbach does not represent a party in

11  this lawsuit.  As noted above, the Court understands Mr. Villa to be enrolled as a member of

12  Defendant Intervenors, the Ione Band; however, Mr. Villa clearly takes a position that Defendant

13  Intervenors do not take.  Defendant Intervenors, represented by the law firm Holland & Knight,

14  LLP, state they have not authorized Mr. Villa's attorney, Mr. Kallenbach, to represent them.

15  (ECF No. 77-1 ¶ 4.)  Mr. Villa's position is that his group – the group he maintains has a true

16  historical affiliation to the Ione Band that has resided in Amador County throughout the twentieth

17  century – is distinct from Defendant Intervenors.  Mr. Villa, or the group he purports to represent,

18  the "Historic Band of Miwok Indians," has not sought to intervene in this lawsuit and therefore

19  there is no party on whose behalf Mr. Kallenbach may appear.   For that reason, the Court sets

20  aside its October 21, 2014 Order (ECF No. 76) granting Mr. Kallenbach pro hac vice status.

21          Second, beginning in 1995, the "Ione Band of Miwok Indians of California" has appeared

22  on the Department of Interior's list of federally recognized Indian tribes that is published in the

23  Federal Register.  (AR4826; 79 Fed. Reg. 4748.)  Whether Defendant Intervenors or Mr. Villa's

24  group are the correct designee for the designation that appears in the Federal Register, is not the

25  issue before this Court.  No parties in this lawsuit, or in Case No. 1710, make allegations that the

26  current tribal membership or leadership of Defendant Intervenors misrepresents the true Ione

27  Band, and that the ROD can be found valid only when the correct Ione faction has been

28  substituted for such members or leaders.  The issues presented in this case, and in Case No. 1710,

1    primarily concern whether the Ione Band was under federal jurisdiction in 1934, 25 U.S.C. § 479,

2    and whether the Ione Band meets the "restored lands" provision stated in 25 U.S.C. §

3    2719(b)(1)(B)(iii).  In this Court's estimation, Mr. Villa's supporting briefing strengthens

4    Defendants and Defendant Intervenors' position that there is a historically distinct Indian tribe,

5    which appears in the Federal Register as the "Ione Band of Miwok Indians of California," and

6    which was under federal jurisdiction in 1934.  Mr. Villa's supporting briefing makes a challenge

7    as to whether the membership group represented by Defendant Intervenors, on whose behalf trust

8    acquisition will occur, is the appropriate referent for the "Ione Band of Miwok Indians of

9    California" designation that appears in the Federal Register.  However, no party in this lawsuit, or

10   in Case No. 1710, has made that challenge.

11          The Court reiterates that Mr. Villa challenged the ROD on the aforementioned grounds in

12   Case No. 13-cv-700, but voluntarily dismissed that lawsuit.  Mr. Villa has not made a motion

13   under Fed. R. Civ. Proc. 24 to intervene in this case or in Case No. 1710.  The Court's

14   Memorandum and Order here makes no disposition of Mr. Villa's claims, including whether

15   those claims are relevant to the validity of the ROD.

16      **II.      The administrative record & the Assistant Secretary's authority**

17          Plaintiffs argue that the submitted administrative record is incomplete and distorted.

18   Plaintiffs argue Secretary Laverdure did not have time to review the record in the month after his

19   appointment in April 2012 and issuance of the ROD in May 2012.  (ECF No. 72–1 at 5.)

20   Plaintiffs argue that documents from the UC Davis Special Collections Files reveal that the

21   "federal government decided that it could not buy land or provide any federal assistance to the

22   Ione Indians because they were 'non-ward' and 'non-tribal' homeless California Indians that were

23   not under federal jurisdiction in 1934 … It is now apparent that pertinent federal documents from

24   the 1930s discussing the non-applicability of the IRA to the Ione Indians were deleted from the

25   record and/or AR before it was filed with Court."  (ECF No. 93 at 9.)

26          Although these are relevant concerns, Plaintiffs do not direct the Court to documents in

27   the record, or omitted from the record, that establish that the Department was arbitrary and

28   capricious in finding the Ione Band under federal jurisdiction in 1934.  Plaintiff attaches a letter

18

1   from then Superintendent of Indian Affairs, Sacramento, O.H. Lipps, August 15, 1933, to the

2   Commissioner of Indian Affairs, which describes the Indians living near Ione at that time.  That

3   letter stated: "The situation of this group of Indians is similar to that of many others in this

4   Central California area.  They are classified as non-wards under the rulings of the Comptroller

5   General because they are not members of any tribe having treaty relations with the Government,

6   they do not live on an Indian reservation or rancheria, and none of them have allotments in their

7   own right held in trust by the Government.  They are living on a tract of land located on the

8   outskirts of the town of Ione."  (ECF No. 93, Ex. 2.)  However, as the aforementioned

9   communications show, this letter does not describe the Ione Band in an inconsistent way,

10  compared to other documents within the record discussing the situation of the Ione Band in the

11  early 20th Century.[12]  Plaintiffs do not identify documents establishing the position Plaintiffs put

12  forth: that the Ione Band was not a recognized tribe under federal jurisdiction in 1934.

13          Plaintiffs also argue that Assistant Secretary of Indian Affairs Laverdure lacked the

14  authority to take the Plymouth Parcels into trust.  Plaintiff argues that before Secretary

15  Laverdure's tenure, Assistant Secretary of Indian Affairs Larry Echo Hawk declined to take the

16  subject lands into trust (as evidenced by the 2009 Bernhardt memorandum and draft opinion).

17  (AR7112.)  Plaintiffs argue that the Department's position abruptly changed upon the

18  appointment of Secretary Laverdure in early 2012.  Plaintiffs also argue Secretary Laverdure

19  worked on and promoted the Ione Indian application with the Department prior to his

20  appointment as Secretary.

21          Factual disputes aside about what Secretary Echo Hawk may or may not have intended,

22  Plaintiffs cite no authority for the proposition that the acting Assistant Secretary of Indian Affairs

23  may not take land into trust.   Under 25 U.S.C. § 1a, the Secretary of the Interior is authorized to

24  delegate his power and duties to the Commissioner of Indian Affairs (now the Assistant Secretary

25  of Indian Affairs).  According to Defendants, pursuant to the Federal Vacancies Reform Act, 5

26  U.S.C. §§ 3345–3349d, Secretary Echo Hawk put in place a succession plan which provided for

27  the appointment of the Principal Deputy Assistant Secretary (in this case Mr. Laverdure) if Mr.

28  ───────────────
[12] *See* "Background" section of this Order, *supra*.

1   Echo Hawk resigned.  Mr. Echo Hawk resigned, leading to the appointment of Secretary

2   Laverdure in 2012, who in that position approved the instant trust acquisition.  Plaintiffs do not

3   identify a legal error in this chain of events.

4   **III.    Claim One**

5         Claim 1 in the FAC alleges that the Secretary of the Interior lacks the authority to take

6   land into trust for the Ione Band because it was not a "recognized tribe now under Federal

7   jurisdiction" in 1934 when the IRA was enacted.  25 U.S.C. § 479.  The Court notes the following

8   arguments raised by Plaintiff in the instant case.[13]

9   A. *Carcieri v. Salazar*, 555 U.S. 379 (2009)

10        Plaintiff argues that *Carcieri v. Salazar*, 555 U.S. 379 (2009) precludes the Ione Band

11  from being a "recognized Indian tribe now under Federal jurisdiction" in 1934 when the IRA was

12  enacted.  Plaintiff also argues that the Department is not entitled to deference for construing the

13  term "under Federal jurisdiction," § 479, to be ambiguous and thus creating its own two-party

14  inquiry for deciding whether a tribe was under federal jurisdiction in 1934.  The Court disagrees

15  with these arguments.

16        *Carcieri* involved the Narragansett tribe, indigenous to Rhode Island, but who in 1880 had

17  relinquished its tribal authority at the behest of the State.  The Tribe also agreed to sell all but two

18  acres of its remaining reservation land for $5,000, but almost immediately regretted that decision

19  and embarked on a campaign to regain its land and tribal status.  In the early 20th century,

20  members of the Tribe sought economic support and other assistance from the federal government,

21  as evidenced by correspondence spanning a 10-year period from 1927 to 1937. The tribe filed suit

22  in the 1970s to recover its ancestral land, and in 1978, the tribe received title to 1,800 acres,

23  subject to the laws of Rhode Island.  *Id.* at 383–84.

24        The BIA granted formal federal recognition to the tribe in 1983.  48 Fed. Reg.

25  6177.  Thereafter, the tribe purchased 31 acres of land, adjacent to the 1,800 acres of settlement

26  lands.  As an alternative to complying with local regulation over the 31 acres, the tribe sought

27  trust acquisition by the Department, 25 U.S.C. § 465, which permits the Secretary of the Interior

28  ────────────────
[13] The Court engaged in a longer analysis of this issue in Case No. 1710, ECF No. 95.

1   to accept land into trust for "the purpose of providing land for Indians." This prompted the

2   inquiry into the definition of Indian, which is defined in § 479 as "all persons of Indian descent

3   who are members of any recognized Indian tribe now under Federal jurisdiction." That question,

4   in turn, brought the Supreme Court to the central issue in *Carcieri*: "whether the word 'now'

5   under Federal jurisdiction' refers to 1998, when the Secretary accepted the 31–acre parcel into

6   trust, or 1934, when Congress enacted the IRA." *Id.* at 385–388.

7       *Carcieri* found the statutory language unambiguous: "the word 'now' § 479 limits the

8   definition of 'Indian,' and therefore limits the exercise of the Secretary's trust authority under §

9   465 to those members of tribes that were under federal jurisdiction at the time the IRA was

10   enacted." *Id.* at 390.

11       The next issue one might expect *Carcieri* to address would be: was the Narragansett tribe

12   under federal jurisdiction in 1934? But "[n]one of the parties or *amici,* including the Narragansett

13   Tribe itself, ha[d] argued that the Tribe was under federal jurisdiction in 1934. And the evidence

14   in the record [was] to the contrary." *Id*. at 395. That is precisely the difference in argument

15   between the Department's position in *Carcieri* and the Department's position in the instant

16   case. Here, the Department argues heavily – and the administrative record is replete with

17   documentation from the early twentieth century in support – that the Ione Band was under federal

18   jurisdiction in 1934.

19       Plaintiff argues that *Carcieri* precludes affording deference to the Department's own

20   standards for determining whether a tribe was under federal jurisdiction in 1934. The Court

21   disagrees. What the Supreme Court found unambiguous was that § 479 limited trust acquisition

22   to tribes under federal jurisdiction in 1934, not tribes who became under federal jurisdiction at a

23   later point. *Carcieri* did not address the standards for being under federal jurisdiction. As Justice

24   Breyer noted in his concurrence:

25       [A]n interpretation that reads 'now' as meaning 'in 1934' may
        prove somewhat less restrictive than it at first appears. That is
26       because a tribe may have been 'under Federal jurisdiction' in 1934
        even though the Federal Government did not believe so at the time.
27       We know, for example, that following the Indian Reorganization
        Act's enactment, the Department compiled a list of 258 tribes
28       covered by the Act; and we also know that it wrongly left certain

21

1
2
3
4

> tribes off the list. The Department later recognized some of those
> tribes on grounds that showed that it should have recognized them
> in 1934 even though it did not. And the Department has sometimes
> considered that circumstance sufficient to show that a tribe was
> 'under Federal jurisdiction' in 1934—even though the Department
> did not know it at the time.

5

*Id.* at 398 (citations omitted).[14]

6

7

8

      It strikes the Court that there is far more ambiguity than not about what it means for a

9

tribe to be "under Federal jurisdiction" in 1934, even if the time at which a tribe must have been

10

under federal jurisdiction is not ambiguous.  Accordingly, the Court affords deference to the

11

Department for the construction of its two-part inquiry for determining whether a tribe was under

12

federal jurisdiction in 1934.  See *Confederated Tribes of the Grand Ronde Comm.'n of Ore. v.*
*Sally Jewell, et al.*, 2014 WL 7012707 at *9–11 (D.D.C. Dec. 12, 2014) (applying Chevron
deference to the Department's promulgation of the two-part inquiry).

13

14

      As stated in the ROD, the first part of that test considers whether at or before 1934 the

15

federal government had taken action to establish "obligations, duties, responsibility for or

16

authority over the tribe."  (AR10105.)  The second part "ascertains whether the tribe's
jurisdictional status remained intact in 1934." (AR10105.)

17

      The ROD found the Ione Band met that two-part test for reasons including: the Band's

18

being a successor in interest to Treaty J in the mid-1800s; efforts to document members of the

19

Band in the early 1900s; efforts to acquire a 40-acre parcel for the Band; failed – but consistent –

20

attempts to complete the acquisition of land for the Ione Band continuing into the 1930s; a

21

petition by the Ione Band again in 1941 to complete the acquisition; beginning in the 1970s,

22

efforts by the California Indian Legal Services to complete a trust acquisition for the Band; the

23

1972 determination by Commissioner Bruce that federal recognition had been extended to the

24

Ione Band; a 2006 Indian Lands Determination by the Department that the Plymouth Parcels were

25

gaming eligible; and the fact that, in 2011, the U.S. District Court for the District of Columbia

26

previously recognized the Ione Band's "long-standing and continuing governmental relationship

27

28

---

[14] The majority decision in *Carcieri* states the law, and that precedent binds this Court.  Justice Breyer's concurrence
is cited here as persuasive reasoning, and which is not, in any event, in conflict with the majority decision.

1 | with the United States," *Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170, 198 (2011).

2 | (AR10108–11.)

3 | / / /

4 | B.  The *Burris* litigation

5 |      Plaintiffs argue that the Court's judgment in the *Burris* litigation is binding on the parties

6 | and conclusively establishes that the Ione Band was not a recognized tribe under federal

7 | jurisdiction in 1934.  *See Ione Band of Miwok Indians v. Burris*, Civ. S-90-993 LKK (E.D.Cal.

8 | April 22, 1992) (hereinafter referred to as "Judge Karlton's Order").  Competing factions of the

9 | Ione Band and the Department appeared as parties in that case.  The federal government argued

10 | that the Ione Band was not a federally recognized Indian tribe, and Judge Karlton's Order

11 | likewise explained that plaintiffs (the Ione Band) had not demonstrated they were entitled to

12 | recognition outside of the Part 83 process.  (AR7779.)

13 |      Plaintiffs also point out that in May, 1992, the Regional Director of the BIA declined to

14 | review the economic development agreement between the Ione Band and a private development

15 | company on the grounds that the Ione Band was not a federally recognized tribe.  The Interior

16 | Board of Indian Appeals ("IBIA") upheld that decision, referencing Judge Karlton's order for the

17 | proposition that the Part 83 regulations were the proper means by which recognition could be

18 | achieved, which the Ione Band had not underwent.  (AR811–813.)  In 1997, the Nicolas Villa Jr.

19 | faction of the Ione Band initiated another lawsuit against the County of Amador in this District,

20 | seeking to restrain Amador County from invoking regulatory jurisdiction over their property

21 | based on the claim that it was Indian Country.  This Court denied that request, referencing an

22 | August 5, 1996 order from the *Burris* litigation, which had ruled that Villa and his supporters did

23 | not constitute the government of the Ione Band and the Ione Band had no recognized tribal

24 | governmental.  (AR1172.)

25 |      In the instant matter, Plaintiffs now argue that Defendants and Defendant Intervenors are

26 | collaterally estopped from arguing the Ione Band had achieved federal recognition.  Collateral

27 | estoppel is applicable when: (1) the issue to be precluded must be the same that was decided in

28 | the prior lawsuit; (2) the issue must have been actually litigated in the prior lawsuit; (3) the issue

1   must necessarily have been decided in the prior lawsuit; (4) the decision must have been final and

2   on the merits; and (5) the party against whom preclusion is sought must be the same or in privity

3   with the party in the prior lawsuit.  *Baldwin v. Kilpatrick*, 249 F.3d 912, 917–18 (9th Cir. 2001).

4          However, the main issue identified now – whether the Ione is federally recognized – is not

5   identical to the issue addressed in Judge Karlton's order.  Whether the Ione Band could in fact

6   achieve federal recognition was not decided in Judge Karlton's Order.  The issue in Judge

7   Karlton's Order was the federal government's motion for summary judgment on grounds that it

8   had not waived its sovereign immunity from suit.  Judge Karlton held that the government had not

9   waived its immunity as to plaintiffs' claim because the APA waiver[15] applies only where there is

10  final agency action, and the plaintiffs' failure to apply for recognition through the part 83

11  regulations barred their claims due to a lack of final agency action ripe for review.  Hence, Judge

12  Karlton ruled:

13             Plaintiffs' argument appears to be that these non-regulatory
              mechanisms for tribal recognition demonstrate that "the Secretary
14            may acknowledge tribal entities outside the regulatory process,"
              [citation], and that the court, therefore, should accept jurisdiction
15            over plaintiffs' claims compelling such recognition.  I cannot agree.
              Because plaintiffs cannot demonstrate that they are entitled to
16            federal recognition by virtue of any of the above mechanisms, and
              because they have failed to exhaust administrative remedies by
17            applying for recognition through the BIA's acknowledgement
              process, the United States' motion for summary judgment on these
18            claims must be GRANTED.

19  (AR7779.)

20         Those specific routes to federal recognition outside of the Part 83 process, which plaintiffs

21  had not shown were viable, included: Congressional recognition and/or via treaty, the

22  government's resolution of tribal acknowledgment petitions, the "wholesale listing of Alaska

23  native entities" in the 1988 Federal Register, and recognition arising out of government

24  settlement of litigation in the 1950s and 1960s.  (AR7778.)  Defendants and Defendant

25  Intervenors argue tenably, however, that administrative restoration outside of the Part 83 process

26  is a legitimate route for restoration of recognition in this case.  *See Grand Traverse Band of*

27  *Ottawa and Chippewa Indians v. Office of U.S. Atty. for Western Div. of Michigan*, 369 F.3d 960,

28  ───────────────
    [15] *See* 5 U.S.C. § 702.

                                           24

1    969 (6th Cir. 2004) ("The result of this administrative acknowledgment was a restoration of

2    federal recognition, a necessary component of which includes the resumption of the government's

3    political relationship with the Band … On the facts of this case, a tribe like the Band, which was

4    administratively 'acknowledged,' also is a 'restored' tribe.")

5            Defendant Intervenors also explain that the context for the aforementioned 1996 order,

6    issued later in the *Burris* litigation, was a tribal split among competing factions of the Ione Band;

7    hence there was no identifiable leadership capable of prosecuting the *Burris* litigation on behalf

8    of the Band.  That is, the point was not that the Ione Band had not or could not be federally

9    recognized, but that the Ione Band lacked a legitimate tribal government.  (AR1153–58; ECF No.

10   91-1 at 32.)  That appears to be a correct interpretation of the court's August 5, 1996 order.

11   Indeed, by that time, the Ione Band had been included on the list of federally recognized tribes

12   published in the Federal Register.  Regarding the 1992 IBIA decision, the IBIA later recognized

13   the 1994 Deer determination.  (AR1177 and n. 4.)

14           It is also not apparent that there is privity of parties, as the *Burris* litigation involved

15   competing factions of the Ione Band, including one faction opposing the federal government and

16   claiming it is federally recognized.  That is not the case here, where the Ione Band appears as a

17   single party claiming that it is federally recognized.

18           Arguably, the facts have changed since Judge Karlton's Order, so as to make inapplicable

19   the doctrine of collateral estoppel:  "If different facts are in issue in a second case from those that

20   were litigated in the first case, then the parties are not collaterally estopped from litigation in the

21   second case. If the litigated issues are the same—the same facts at issue—estoppel will apply and

22   an offer of different proof in a later case will not provide escape." *Levi Strauss & Co. v. Blue*

23   *Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir. 1985).  Arguably, relevant different facts subsequent to

24   the Judge Karlton Order are: Assistant Secretary Deer reversed course in 1994 and determined

25   that the Ione Band was federally recognized; the federal government presented that changed

26   position to the Court before that litigation concluded; in 1995, the Ione Band appeared on the

27   Federal Register's list of federally recognized tribes and has been included on each list since; the

28   Ione Band initiated the instant trust acquisition in the early 2000s with the understanding that it

25

1  was a federally recognized tribe; the Department promulgated the Part 292 regulations, 25 C.F.R.

2  292.1–26, including section 292.26(b) which contributes to the Department's finding that the

3  Band is a "restored" tribe; and the Department recorded its decision to complete the trust

4  acquisition based on the understanding that the Ione Band was a recognized tribe.[16]

5        Plaintiff also argues that the positions taken by the federal government and individual

6  defendants in the *Burris* litigation – that the Ione Band was not federally recognized – are binding

7  because they are judicial admissions.  *See American Title Ins. Co. v. Lacelaw Corp.* 861 F.2d 224,

8  226 (9th Cir. 1988) ("Judicial admission are formal admissions in the pleadings that have the

9  effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact

10  … [they are] conclusively binding on the party who made them.")  However, there is distinct

11  difference between the individual defendants making those admissions and the party that now

12  appears before the Court, the Ione Band.  With respect to the federal government, the record

13  demonstrates that it had changed its position regarding the status of the Ione Band prior to the

14  conclusion of the *Burris* litigation.  (AR1133.)

15        For the foregoing reasons, the Court does not find the Department's decision to acquire

16  the Plymouth Parcels in trust, based upon a determination that the Ione Band was a recognized

17  Indian tribe under federal jurisdiction in 1934, to be arbitrary and capricious.

18  **IV.    Claim Two**

19        Claim 2 in the FAC alleges that the Department failed to comply with its regulations, 25

20  C.F.R. §§ 151.10, 151.11, and 151.13, when it reviewed and approved the ROD.  The Court states

21  each argument below.

22        Section 151.10(a) requires the Secretary to consider if there is any statutory authority for

---

[16] An interesting counterpart to this would be that all the relevant "facts" actually occurred sometime prior to June 1934 when the IRA was enacted.  According to the Department's two-part inquiry for whether a tribe was "under federal jurisdiction" in 1934, what is relevant is whether there was a particular relationship between the federal government and an Indian tribe in 1934 and before, and whether that relationship remained intact in 1934.  Subsequent events may *reveal* different aspects of whether the Ione Band was in fact under jurisdiction in 1934.  For example, in present day, a tribe may produce evidence to show it was under federal jurisdiction in 1934, even though the Department did not know it at the time.  *Carcieri*, 555 U.S. at 398.  But nothing occurring after June 1934 would *change* those facts constituting whether, actually, a tribe was under federal jurisdiction in June 1934.  The main issue here is whether, actually, the Ione Band was under federal jurisdiction in 1934, not whether the government's actions in the 1990s and afterwards now make it easier to construe the Ione Band as being under federal jurisdiction.

1    the proposed acquisition and, if so, any limitations contained in such authority.  Plaintiffs argue

2    the Secretary lacks authority to takes lands into trust on behalf of the Ione Indians who were not

3    federally recognized in 1934.  As discussed in this Order and in the Court's Order in Case No.

4    1710, the Court finds the Department's determination that the Ione Band was a "recognized

5    Indian tribe now under Federal jurisdiction" in June 1934, 25 C.F.R. § 479, to be reasonable.

6         Section 151.10(b) requires the Secretary to consider if there is a need for the acquisition of

7    additional lands.  The ROD states that the Ione Band currently has no reservation or trust lands.

8    (AR10112.)  Plaintiffs argue the ROD does not address the fact that the Ione Indians own and

9    occupy other properties in Amador County near Ione which has been sufficient to meet their

10   needs.  The application of the Ione Band to the Department seeking trust acquisition stated that

11   the "Ione Band has no reservation and no land in trust" and "[w]ithout trust land, [it] has had little

12   opportunity for successfully economic development and little chance at true self-governance."

13   (AR2757.)  Plaintiffs do not argue that the properties it references – those outside of the Plymouth

14   Parcels – meet this need in the way trust-acquisition of a gaming-eligible property would.

15        Section 151.10(c) requires the Secretary to consider the purpose for which the land will be

16   used.  Plaintiffs argue the ROD is incomplete because, although it outlines the casino project, it

17   fails to reveal or study that the project also includes the construction of 162 private residences on

18   the Plymouth Parcels.  (AR10112–13.)  Defendants respond that the ROD "nor any other [pages]

19   in the AR demonstrate that this alleged residential development has ever been part of the Tribe's

20   [fee-to-trust] proposal."  (ECF No. 90-1 at 37.)  As Plaintiffs do not further explain either whether

21   this proposed construction will occur, or why the ROD must be overturned on this ground, this

22   argument does not compel a finding that the Department was arbitrary and capricious in not

23   mentioning the additional construction of 162 private residences.

24        Section 151.10(e) requires the Secretary to consider the impact on state and local

25   government if the land is acquired in "unrestricted fee status" and removed from the tax rolls.

26   Plaintiff argues there is no evidence in the ROD to demonstrate that the Parcels will be acquired

27   in unrestricted fee status, and therefore be eligible to be exempt from state and local tax.

28   Defendants respond that the Parcels are not proposed to be acquired in unrestricted fee status.

27

1   The ROD also explains that the Department has relied upon the fiscal mitigation provisions

2   previously addressed during the "now voided Municipal Services Agreement" ("MPA

3   agreement"). These provisions "include payments, commencing at the time of the fee-to-trust

4   transfer of the Plymouth Parcels, of an annual contribution equal to the current tax rate to the City

5   of Plymouth and Amador County to address lost property tax revenues. The amount of payment

6   shall be subject to annual review by the Amador County Assessor with any adjustments made

7   with concurrence by the Tribe. The Department finds that the impacts of removing the subject

8   property from the tax rolls are not significant because of the degree to which the Tribe's direct

9   and indirect payments to the Amador County offset the loss of real property taxes that would

10  occur." (AR10113.) Therefore, without more, the Court does not find the Department was

11  arbitrary and capricious on these grounds.

12       Section 151.10(f) requires the Secretary to consider jurisdictional problems and possible

13  conflicts of land use. Plaintiffs argue this issue is not discussed in the ROD and the voided MPA

14  agreement does not exempt the Parcels from state and local land use. The ROD states: "Through

15  the incorporation of the voided MSA provisions within the [Final Environmental Impact

16  Statement], the Tribe has agreed to address all major jurisdictional issues, including, but not

17  limited to compensating the County Sheriff's Department, prosecuting attorney's office, courts,

18  and schools that will provide public services on the Tribe's trust lands." (AR10113.) *See also*

19  AR10027 (BIA Regional Director's Rec. Mem. stating: "the Tribe intends to work cooperatively

20  with the local jurisdictions to ensure that the casino project is harmonized with the surrounding

21  community" and that the Parcels will be "subject to federal and tribal law which includes

22  stringent environmental, health, and safety requirements"). Without more, the Court does not

23  find the Department was arbitrary and capricious on these grounds.

24       Section 151.11(c) requires the tribe provide a plan to the Secretary which specifies the

25  anticipated economic benefits associated with the proposed use. Section 151.10(h) requires the

26  Secretary to consider whether a tribe has provided sufficient, specific information to insure that

27  the potential environmental impacts of the project are considered before the land is taken into

28  trust. Section 151.10(g) requires the Secretary to consider whether, if the land is taken into trust,

1  the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of

2  the land in trust status.  Section 151.13 requires a tribe to furnish title evidence meeting the

3  *Standards For the Preparation of Title Evidence in Land Acquisitions by the United States* issued

4  by the United States Department of Justice.  Plaintiffs argue either that the ROD does not address

5  these issues or that the Ione Band has not submitted the proper information to the Secretary for

6  consideration in the ROD.  The Court declines to go through a point by point analysis refuting

7  each of Plaintiff's arguments.  A clear reading of the ROD and the record in this case indicates

8  that, if not addressed in the ROD, the record indicates all of these regulations were addressed.

9  (*See* Regional Director's Rec. Mem., AR10027–31.)  Furthermore, Plaintiffs identify no specific

10  problem associated with alleged non-compliance with these regulations.

11       For the foregoing reasons, the Court finds Plaintiffs has failed to establish the

12  Department's non-compliance with the aforementioned regulations, so as to render the instant

13  trust acquisition arbitrary, capricious, unlawful, or an abuse of discretion.

14  **V.     <u>Claim Three</u>**

15       As to Claim 3 Plaintiffs argue that . . .  "the Parcels are privately owned by third parties

16  who hope to partner with the Ione Indians and benefit financially from the construction and

17  management of a mega-casino in the town of Plymouth.  The DOI's and Mr. Laverdure's decision

18  to take the privately owned Parcels into trust in favor of the Ione Band, free from state and local

19  regulation, as though it is public domain land, is an unconstitutional infringement on state and

20  local police power to regulate its citizenry for the benefit of all.  It is also a violation of the equal

21  footing doctrine and the principles of federalism … The ROD is an overreach of the limited

22  authority Congress gave to the Secretary under the IRA to restore allocated reservation land or to

23  create reservation from public domain land."  (ECF No. 93 at 16.)

24       As an initial matter, Plaintiffs do not establish they have standing to assert the interests of

25  the State of California.  *See City of Roseville v. Norton*, 219 F. Supp. 2d 130, 146 (D.D.C. 2002).

26  That issue aside, the authorities cited by Plaintiff are inapposite.  Plaintiffs cite *Hawaii v. Office*

27  *of Hawaiian Affairs*, 129 S. Ct. 1436 (2009) for the principle that once land is conveyed by the

28  United States to a state it cannot be returned to federal jurisdiction in contravention of the nature

1    of the original grant to the state. (ECF No. 93 at 17.)  But *Hawaii* did not foreclose – much less

2    mention – the specific issue here: whether a fee-to-trust transfer from private ownership to trust is

3    permissible under the IRA.  Thus, *Hawaii* is inapposite.

4        Plaintiffs cite *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005) for the

5    proposition that a tribe does not have the authority to unilaterally create a reservation from fee

6    owned lands.  But *Sherrill* concerned whether a tribe was prohibited from claiming tax immunity

7    over property within its reservation that it had purchased on the free market.  The *Sherrill* court

8    endorsed the same fee-to-trust acquisition procedures used in the instant case.  *Id.* at 220–21.

9        Plaintiffs also argue that the instant trust acquisition violates a Congressional Act from

10   April 8, 1864, 13 Stat. 39.  That Act "designated California as one Indian superintendency. It also

11   recited that 'there shall be set apart by the President, and at his discretion, not exceeding four

12   tracts of land, within the limits of said state, to be retained by the United States for the purposes

13   of Indian reservations.'"  *Mattz v. Arnett*, 412 U.S. 481, 489 (1973).  *See Donnelly v. United*

14   *States*, 228 U.S. 243, 256 (1913) ("The terms of this enactment show that Congress intended to

15   confer a discretionary power, and from an early period Congress has customarily accorded to the

16   Executive a large discretion about setting apart and reserving portions of the public domain in aid

17   of particular public purposes.")  Plaintiff's argument is that the instant trust acquisition constitutes

18   an additional "reservation," exceeding those four permitted.  However, the Act is not apposite

19   here because the instant trust acquisition does not involve the setting aside of a portion of the

20   public domain.  Plaintiff's argument on this point appears to question the constitutionality of the

21   Secretary's authority to take land into trust under § 476 simply as a general matter.  Plaintiffs do

22   not cite authority for the proposition that any reservation land in California acquired as trust

23   property, beyond the four tracts of land designated in the aforementioned Act of 1864, is

24   impermissible.  Thus, Plaintiff's argument is unavailing.

25       In response to Plaintiffs reference to the Equal Footing doctrine, in rejecting this

26   argument, the Court will follow the analysis provided by the *Norton* court:

27           The Equal Footing Doctrine derives from the Statehood Clause of
             the Constitution, which the Supreme Court has construed as
28           imposing a duty not to admit political organizations which are less

or greater, or different in dignity or power, from those political entities which constitute the Union.  The doctrine prevents the Federal Government from impairing fundamental attributes of state sovereignty when it admits new States into the Union.  Thus, the Federal Government ... cannot dispose of a right possessed by the State under the equal-footing doctrine of the United States Constitution.

Plaintiffs have not alleged that the taking of the parcel in trust for the Tribe will in any way impair the sovereignty of the State of California such that California will no longer be equal to other states in the Union. Nor have plaintiffs alleged that California has been denied any constitutionally guaranteed right by the fact that some state laws may be preempted by federal Indian legislation. The federal government possesses plenary power with respect to Indian affairs.  The exercise of this plenary power simply does not constitute a violation of the equal footing doctrine.

*Norton*, 219 F. Supp. 2d at 153 (internal citations omitted).

To the extent Plaintiff invokes the Tenth Amendment to the U.S. Constitution ("[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"), the plenary power of Congress and the President over Indian Affairs is well-established. *Morton v. Ruiz*, 415 U.S. 199, 231 (1974); 25 U.S.C. § 9; 25 U.S.C. § 2 (providing the Commissioner of Indian affairs "management of all Indian affairs and of all matters arising out of Indian relations").

The Court does not find Plaintiffs' challenge to the ROD, on the basis of the aforementioned federalism principles, establishes that the instant trust acquisition is arbitrary, capricious, unlawful, or an abuse of discretion.

## VI.    <u>Claim Four</u>

Lands taken in trust acquired after October 17, 1988, are not gaming eligible, 25 U.S.C. § 2719, unless an enumerated exception applies.  Here, the exception relied upon by the Department is § 2719(b)(1)(B)(iii): "the restoration of lands for an Indian tribe that is restored to Federal recognition."  Plaintiffs argue simply that this exception is not applicable in this case. The Court has considered this issue in its Order on the cross motions for summary judgment, Case No. 1710 – particularly the "restored tribe" part of section 2719(b)(1)(B)(iii) – and incorporates by reference its analysis from that Order.[17]

---

[17] The Court has addressed the restored lands for a restored tribe provision, 25 U.S.C. § 2719(b)(1)(B)(iii), with

1    In brief: after first applying the grandfathering provision, 25 C.F.R. § 292.26(b), the ROD

2    discusses the Band's land acquisition attempts, the Bruce determination, and the inconsistent

3    positions taken by the government thereafter until the time of the Deer restoration – thus the ROD

4    finds the Ione Band to be a "restored tribe". (AR10101–02.)  The ROD also discusses the

5    historical significance of the Plymouth Parcels to the Ione Band, the Band's modern connection to

6    the Plymouth Parcels, and the closeness in time between restoration of the tribe and attempts to

7    acquire the Parcels, thus establishing them as "restored lands".  The "ROD thus records the

8    Department's that the Plymouth County Parcels are eligible for gaming under the 'restored lands'

9    exception in IGRA Section 20, 25 U.S.C. § 2719(b)(1)(B)(iii)."  (AR10102.)

10    The FAC states:  "Parcels [are not] 'restored lands' under IGRA for at least three reasons.

11    First the Ione Indians are not landless. They have a potential ownership interest: (1) in 40 acres

12    near Ione; (2) property in the City of Ione, (3) commercial property in the City of Plymouth, and

13    (4) five parcels totaling 47 acres adjacent to Plymouth. Second, any ancestral lands of the Ione

14    Indians in Amador County were relinquished in the last half of the 19th century.  And third any

15    claim by Ione Indians in Amador County for compensation for any ancestral lands was settled in

16    the first half of the 20th century.  Furthermore the subject Parcels are far from Ione and any

17    potential ancestral or historical claims of the Ione Indians."  (FAC ¶ 85.)

18    The Court notes this argument, but finds it does not compel a finding that the Department

19    was arbitrary and capricious in finding the "restored lands" exception was met.  Plaintiffs do not

20    support their argument that the Plymouth Parcels are far from any potential ancestral or historical

21    claims of the Ione Indians, or support their argument that property already owned by the Ione

22    Band will support the purpose and need of the proposed project.

23    For the foregoing reasons, the Court does not find that the Department's restored lands

24    analysis demonstrates that the instant trust acquisition is arbitrary, capricious, unlawful, or an

25    abuse of discretion.

26    **VII.   Claim Five**

27    Claim 5 in the FAC alleges that the Department failed to comply with NEPA when it

28    greater thoroughness in Case No. 1710, ECF No. 95, pp. 35–46.

1    reviewed and approved the fee-to-trust transfer and the casino project.  Specifically, Plaintiffs

2    allege the Department did not adequately consider the traffic, water quality, and air quality of the

3    proposed project.  These negative impacts include: increases in traffic congestion and safety

4    concerns on rural road in the area, increases in air pollution, increases in water pollution, the

5    overuse of limited water resources, and potential increase in crime.  Plaintiff also alleges the Final

6    Environmental Impact Statement ("EIS") wrongfully assumed that non-Indian interests did not

7    require equal consideration against the interests of the Ione Band when considering the

8    environmental impacts of the proposed project.

9        However, the EIS considered traffic impacts (AR17023–422); air pollution (AR15784–

10   802); water pollution and use (AR15760–82); and crime and public safety issues (AR15825–39).

11   The EIS also analyzed reasonably foreseeable indirect impacts of the proposed action, including

12   local and regional economic growth, the availability of affordable housing within Amador

13   County, and impacts of off-site traffic mitigation.  (AR16001–05.)  Plaintiffs do not identify

14   specific concerns with the EIS' conclusions.  Without more, the Court finds no basis to invalidate

15   the ROD based on the BIA's NEPA analysis.

16       Plaintiffs also allege that the NIGC failed to consider the negative impacts associated with

17   its "restored lands for a restored tribe" analysis, 25 U.S.C. § 2719(b)(1)(B)(iii), which is

18   contained in Solicitor Artman's 2006 Indian Lands Determination.  However, NEPA's statutory

19   framework calls for a "detailed statement" in the event of "major Federal actions significantly

20   affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This Court ruled that

21   the 2006 ILD was not a final agency action, in *Cnty. of Amador, Cal. v. U.S. Dep't of Interior*,

22   No. CIVS 07-527 LKK/GGH, 2007 WL 4390499 (E.D. Cal. Dec. 13, 2007).  Plaintiff does not

23   provide other authority for the position that the 2006 ILD must contain analysis under NEPA.

24       Plaintiffs also allege that it was impossible for the BIA to be impartial in its environmental

25   analysis, because the BIA acts as the "lead" agency for both the evaluation of the fee-to-trust

26   application and for the EIS documentation.  However, the Court agrees with Defendants' point

27   that federal agencies are frequently charged with undertaking environmental review of projects

28   for which they have an institutional interest.  *See e.g. Headwaters, Inc. v. BLM* 914 F.2d 1174

33

1   (9th Cir. 1990) (BLM properly conducted environmental review process for timber sale in

2   Oregon); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1238–39 (10th Cir. 2004) (U.S. Air Force

3   properly conducted environmental review process for expansion of Air Force Base in New

4   Mexico).

5          For the foregoing reasons, the Court does not find that the Department's NEPA analysis

6   demonstrates that the instant trust acquisition is arbitrary, capricious, unlawful, or an abuse of

7   discretion.

8                                          **CONCLUSION**

9          For the foregoing reasons, the Court finds:

10   •   With respect to the First Amended Complaint, Claim 1, Plaintiffs' Motion for Summary

11       Judgment is DENIED; Defendants' Motion for Summary Judgment is GRANTED; and

12       Defendant Intervenors' Motion for Summary Judgment is GRANTED.

13   •   With respect to the First Amended Complaint, Claims 2 through 5, Defendants' Motion

14       for Summary Judgment is GRANTED; and Defendant Intervenors' Motion for Summary

15       Judgment is GRANTED.

16   Dated:  September 30, 2015

17

18                                          _____

19                                          Troy L. Nunley
                                            United States District Judge

20

21

22

23

24

25

26

27

28

                                                  34